[Civ. No 31410.    Second Dist., Div. Two.    Oct. 14, 1968.]

HAROLD MINNIEAR, Plaintiff and Appellant, v. IVAN TORS et al., Defendants and Respondents.

[Civ. No. 31411.    Second Dist., Div. Two.    Oct. 14, 1968.]

HAROLD MINNIEAR, Plaintiff and Appellant, v. ZIV TELEVISION PROGRAMS, INC. et al., Defendants and Respondents.

(Consolidated Cases.)

Shacknove & Goldman and Ben F. Goldman, Jr., for Plaintiff and Appellant.

Lamar Boren, in pro. per., Trippet, Yoakum & Papiano and F. B. Yoakum, Jr., for Defendants and Respondents.

NUTTER, J. pro tem.*—This case involves appeals from two judgments of nonsuit in cases consolidated for trial. The first case involves a suit against defendants Tors, Boren and

---

*Assigned by the Chairman of the Judicial Council.

Ziv in an action for damages for conspiracy to defraud and convert literary material consisting of a TV pilot film and story outlines for subsequent episodes. The other case was an action against defendant Ziv only for damages upon a contract to purchase literary material for the above TV pilot films. By stipulation the trial in both cases was limited to a trial of liability with the matter of damages reserved until a later date. After 25 days before a jury, the trial judge granted motions for nonsuit and dismissal in each case. Appellant contends that he was deprived of a fair and impartial trial by the trial judge, whom he alleges was prejudiced and continually interfered with the orderly presentation of his case; that the granting of the motions for nonsuit was erroneous inasmuch as there was sufficient and substantial evidence to take both cases to the jury, and finally, that the trial judge made numerous errors in excluding and admitting evidence.

Basically, this court must determine whether there was sufficient evidence for the case to go to the jury in either cause of action. Before discussing the principles of law involved in each cause of action we shall summarize the evidence disregarding all evidence unfavorable to the plaintiff and resolving all conflicts in the evidence in plaintiff's favor.[1]

In mid-1955, plaintiff Minniear, a teacher for RKO Radio Pictures, who had been connected with motion picture studios for 22 years, conceived the idea of making an underwater adventure series for sale to TV. Up to that time such a series had never been attempted on TV. Minniear sought the assistance of an underwater photographer, defendant Boren, and the two agreed to pool their efforts and money in making a pilot film for the adventure series for the purpose of showing it to prospective purchasers, sponsors and TV stations. While no agreement was ever reduced to writing, appellant agreed to furnish the ideas, talent, cast, writers, directors, script, film editor and artistic requirements while defendant Boren was to photograph the pilot and the series and furnish technical

---

[1] "'We may affirm a judgment of nonsuit only when, from a review of the evidence, we can say that, disregarding the fact that there may be a conflict therein, and giving full credit only to that portion of the evidence, whether produced by plaintiff or defendant, which tends to support the allegations contained in plaintiff's complaint, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict for plaintiff if such verdict were given.' (*Kersten* v. *Young*, 52 Cal.App.2d 1, 7 [125 P.2d 501].)" (*Davies* v. *Krasna*, 245 Cal.App.2d 535, fn. 3, p. 550 [54 Cal.Rptr. 37].)

skills and laboratory work. Thereafter, Minniear completed a script and engaged a director and cast for the pilot film.

Appellant engaged Thomas Scott, a film editor of defendant Ziv, to edit and cut the film. Scott had worked for defendants Tors and Ziv previously. During the cutting and editing, Scott used the facilities of Ziv and retained possession of the footage on the Ziv lot. Scott worked on his own time; his work for appellant and his use of Ziv facilities were with knowledge of his superiors. Other Ziv employees were aware of the film cutting on the Ziv lot. A format and the film SEA DIVERS was completed as a pilot for a series involving underwater adventure and intrigue. The director of the film was Leslie Goodwins, who had directed a science fiction episode for Tors and Ziv.

On April 11, 1956, appellant arranged for a private showing of the pilot film to members of the cast, crew and a few interested friends in the Ziv projection room. In response to a request by Director Goodwins to appellant, appellant granted defendant Tors permission to see the film at this showing.

Tors was an experienced producer for Ziv and at the time was a producer of a TV series known as Science Fiction Theatre. He was interested in doing an underwater TV show. Tors watched the film and a prologue, accompanied by his assistant and a Ziv writer. Following the showing, Tors stated to appellant that he found the pilot interesting; that he had been *contemplating making a series on underwater skindivers* but had not found a satisfactory format; that he felt SEA DIVERS *contained an excellent idea*. Tors then asked appellant's director Goodwins ''Where do you go from here?'' Goodwins replied that appellant had several follow up ideas sufficient for an entire season and referred to one involving a jet pilot trapped underwater. Appellant offered defendant Tors a booklet containing the outline of future series which Tors retained. Included was a story about a jet pilot who was trapped under the sea. About a month subsequent to this date, Tors commenced production of SEA HUNT for Ziv. He employed defendant Boren as underwater photographer and attempted to hire appellant's leading man as actor.

Appellant was unsuccessful in his efforts to sell SEA DIVERS and defendant Boren indicated that he wanted nothing further to do with the project and appellant could dispose of the pilot as he saw fit. In May 1956, Tors purchased from Boren for defendant Ziv the story of the jet pilot who was

trapped under the sea and used the idea in the premiere of SEA HUNT in February 1958.

SEA HUNT like SEA DIVERS was based on an underwater adventure format involving an ex-Navy frogman named Mike, using scuba and special underwater equipment. In each series the hero or heroes operated their own boat on a commission for dangerous underwater work. Attractive young girls were featured.

Generally, appellant contends that SEA HUNT was basically SEA DIVERS and defendants employed the same format, stories, character, development and plot plays. In particular, appellant contends the show ''THE GOLD BELOW'' was a substantial copy of the SEA DIVERS pilot; the SEA HUNT jet plane story was taken from the prologue and written synopsis obtained by Tors.

Plaintiff's case is based upon one script and format outlining future episodes. There is no substantial evidence or even a serious contention that the defendants used plaintiff's script as such.

In the SEA DIVERS pilot the heroes, Tom Gorman and Mike Gilbert were ex-Navy frogmen who were hired by a mysterious woman to locate the wreck of a boat which blew up and sank. The mysterious woman requested the heroes to obtain a canister which she ·claimed contained important papers which would clear her deceased father's name. Actually, she was a member of a gang of smugglers. After engaging in underwater salvage operations the heroes engaged in an underwater fight with the villains and the heroes discovered the canister contained smuggled diamonds. Successful in their fight, they turned over the gang to the Coast Guard.

In the first episode of SEA HUNT, ex-Navy frogman, Mike Gilbert, rescued the trapped pilot of a jet which had plunged to the ocean floor leaving the airman only a few minutes of oxygen. Plaintiff had described a similar jet pilot incident in his prologue of the pilot and the outline he gave to Tors.

The Ziv episode ''THE GOLD BELOW'' which appellant claims was taken from the format of the SEA DIVERS pilot involved the recovery of gold dust from the bottom of the ocean; the gold dust bags opened in the process of recovery and the ocean reclaimed the treasure. There is no similarity between appellant's pilot film and ''THE GOLD BELOW'' except for the attempt to find treasure in the deep and the obvious similarities in the idea of an underwater series con-

taining ex-Navy frogmen, underseas equipment adventures and the presence of pretty girls.

Appellant contends in the contract case that while there was no express contract[2] between Ziv and appellant to pay for the SEA DIVERS, there was an implied contract, and it is understood in the industry that when a showing is made, the offeror shall be paid for any ideas or material used therein. In the conversion case, appellant contends the defendants, including Boren, fraudulently agreed and conspired to steal the ideas, property and format of appellant and defraud him of his film and format.

The trial judge in granting the nonsuits stated: "1. There was no evidence proving or tending to prove any express contract by Defendants, or any of them, to pay for any of Plaintiff's or the Joint Venture's or Partnership's, between Plaintiff and Defendant Lamar Boren, films or scripts or formats or ideas or any other property or thing which Plaintiff alleged or claimed or asserted as the subject or basis of this action;

"2. There was no evidence proving or tending to prove any implied or implied-in-fact contract by Defendants, or any of them, to pay for any of Plaintiff's or the Joint Venture's or Partnership's, between Plaintiff and Defendant Lamar Boren, films or scripts or formats or ideas or any other property or thing which Plaintiff alleged or claimed or asserted as the subject or basis of this action;

"3. There was no evidence proving or tending to prove a *conversion* by Defendants, or any of them, of ANY PROPERTY owned by Plaintiff or the Joint Venture or Partnership between Plaintiff and Defendant Lamar Boren;

"4. There was no evidence proving or tending to prove a conspiracy, i.e., a joint tort, on the part of any Defendant with any other Defendant in the doing of any legal wrong, or that any of said Defendants acted as joint tort-feasors or wrongdoers with respect to any property claimed to be owned by Plaintiff either in his individual, private behalf or in his capacity as a Partner or Joint Venturer with Defendant Lamar Boren. Irrespective whether or not Defendant Lamar Boren had no authority to sell to Ziv Television Programs, Inc. the story entitled 'THE DIVER STORY', there was no evidence proving or tending to prove knowledge or notice, actual or constructive, by either Ivan Tors or Ziv Television Programs, Inc. of any lack of authority on the part of De-

---

[2]The complaint was in two counts, an implied and an express contract.

fendant Lamar Boren to sell 'THE DIVER STORY' to Ziv Television Programs, Inc.;

"5. There was and is no substantial similarity between any *protectible portions of the film* entitled 'SEA DIVERS' and the film entitled 'THE GOLD BELOW'. Therefore, *no prima facie action for plagiarism or for violation of common law copyright was proved* or tended to be proved by *Plaintiff*.

" . . . . . . . . . . . . .

"7. As to Defendant Lamar Boren only: the Motion for nonsuit is also granted on the further ground that in this action at law this Court has no jurisdiction to render any judgment with respect to the Joint Venture or Partnership affairs as between Plaintiff Harold Minniear and the Defendant Lamar Boren, in that the Partnership or Joint Venture existing between said individuals, although dissolved, has never been terminated or the affairs of the Joint Venture or Partnership wound up or any accounting had as between them as Joint Venturers or Partners." (Italics added.)

Generally, ideas are not the property of anyone and may be used by all absent a contract to pay for them.

Plaintiff herein has no statutory copyright. His claim must rest upon a protectible property right within the meaning of section 980a of the Civil Code, of an implied contract to pay for his idea. The leading California case which discusses the law pertaining to literary property is *Desny* v. *Wilder,* 46 Cal.2d 715 [299 P.2d 257]. At page 740 the court stated: " 'Literary property' is a general term which is used either to describe the interest of an author (or those who claim under him) in his works (whether before or after publication or before or after copyright has been secured) or to denote the corporeal property in which an intellectual production is embodied. (Bouvier's Law Dict. (1940), p. 731; 34 Am.Jur. 400, § 2; 18 C.J.S. 139, § 3.) Literary property in an intellectual production is afforded protection by the common law (*Werckmeister* v. *American Lithograph Co.* (1904) 134 F. 321 [69 C.C.A. 553, 68 L.R.A. 591] ; see also 34 Am.Jur. 405-406, § 8), by federal statute pursuant to constitutional authorization (see U.S. Const., art. 1, § 8; see also title 17, U.S. Code; *Bobbs-Merrill Co.* v. *Straus* (1908) 210 U.S. 339, 346 [52 L.Ed. 1086, 1091, 28 S.Ct. 722] ), and by state law (Cal. Civ. Code, § 980)."

"If plaintiff has a literary composition it may be the subject of a property right and its use by defendants, if established, could entitle him to remedies, notwithstanding the concessions he has made, which would be unavailable if he had

only an idea to be appropriated or to be the subject of a contract." (*Desny* v. *Wilder, supra,* at page 741.)

In the absence of a protectible property there can be no conversion of an idea. But the law does protect ideas under certain contractual circumstances.

■ "A so-called 'implied-in-fact' contract, however, as the term is used by some writers, may be found although there has been no meeting of the minds." (*Desny* v. *Wilder, supra,* at page 736.) "In the field of entertainment the producer may properly and validly agree that he will pay for the service of conveying to him ideas which are valuable and which he can put to profitable use." (*Desny* v. *Wilder, supra,* at page 738.)

In *Desney, supra,* which involved the submission of an idea for a screen play to a producer's secretary, the court stated at page 734: "The person who can and does convey a valuable idea to a producer who commercially solicits the service or who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover." The court continues (at page 736), quoting from Williston: " 'The parties may be bound by the terms of an offer even though the offeree expressly indicated dissent, provided his action could only lawfully mean assent. . . .' "

"It is not essential to recovery that plaintiff's story or synopsis possess the elements of copyright protectibility if the fact of consensual contract be found. (*Weitzenkorn* v. *Lesser* (1953) *supra,* 40 Cal.2d 778, 791-792 [256 P.2d 947].)" (*Desny* v. *Wilder, supra,* at page 744.) An idea which can be the subject matter of a contract need not be novel or concrete.

"[T]he assent of the writer is found in his submission of the idea or material to the producer, with the *reasonable expectation of payment which can be inferred from the facts and circumstances.* The assent of the producer is manifested by his acceptance of the idea or material submitted under the circumstances, a part of which is that it is reasonably understood that a professional author expects payment of the reasonable value of the *idea* or the *material, if used,* so that the conduct of the producer in accepting it implies a promise to fulfill those reasonable expectations. . . .

" [I]f a producer obligates himself to pay for the disclosure of an idea, whether it is for protectible or unprotectible material, iñ return for a disclosure thereof he should be compelled to hold to his promise. There is nothing unreasonable in the assumption that a producer would obligate himself to pay

for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be unable to use but for the disclosure.

"The producer and the writer should be free to make any contract they desire to make with reference to the buying of the ideas of the writer; the fact that the producer may later determine, with a little thinking, that he could have had the same ideas and could thereby have saved considerable money for himself, is no defense against the claim of the writer. *This is so even though the material to be purchased is abstract and unprotected material.*" (*Chandler* v. *Roach,* 156 Cal.App.2d 435, 440-442 [319 P.2d 776].) (Italics added.) (Idea for a dramatic work based on the activities of the public defender's office.)

Mr. Justice Carter in his concurring opinion in the *Desny* case, at page 756, declared: "[R]eally the only question involved is the *use made of the proffered work* without compensation being made therefor . . . It seems to me that in the ordinary situation, when the so-called 'idea man' has an opportunity to see, or talk with, the *prospective* purchaser, or someone in his employ, it is at that time, without anything being said, known to both parties that the one is there to sell, and the other to buy." (Italics added.)

See also: *Davies* v. *Krasna, supra,* 245 Cal.App.2d 535; an action for breach of an implied contract with respect to the use by the defendant of an idea, central theme and dramatic story that plaintiff created and submitted to defendant. *Donahue* v. *Ziv Television Programs, Inc.,* 245 Cal.App.2d 593 [54 Cal.Rptr. 130]; an action for breach of implied contract for recovery of story idea for format for an underwater TV series.

In *Thompson* v. *California Brewing Co.,* 191 Cal.App.2d 506, 510 [12 Cal.Rptr. 783], the court held that individuals who originate or suggest an idea used by another are properly held to be entitled to be paid when the *circumstances of the disclosure* are such that an agreement to pay can fairly be implied.

As stated in *Rankin* v. *Miller,* 179 Cal.App.2d 133, 139 [3 Cal.Rptr. 496]: "An inference that an agreement was in fact made may be based upon *proof of conduct* as well as upon proof of words." (Italics added.)

Appellant's case must stand or fall on rules applicable to protection of literary ideas and not on the protection of

literary property. Appellant has made no attempt to delineate the elements of protectible property rights in the evidence which would be necessary under a literary property cause of action. Of course, even if an underwater series or the idea for an underwater series was in the public domain the idea would still be subject to contractual protection if the necessary contractual elements are present. Here there is substantial evidence in the record for the jury to infer a reasonable expectation by appellant that the defendant Ziv might buy the idea for a TV underwater series in the spring of 1956. It is not necessary that the seller should definitely state that he is selling his merchandise to the prospective buyer. The agreement of sale may be inferred by the circumstances. (*Desny* v. *Wilder, supra.*)

If Ziv used appellant's ideas and the other elements of a contract were satisfied, the objective test set forth in *Desny, supra,* would justify a jury verdict for appellant.

There is substantial evidence to support an inference that appellant submitted his idea to Tors with the reasonable expectation he would be paid by Ziv if his idea was used. There is also sufficient evidence to support the further inference that Tors acting for Ziv accepted the submission of the idea with full awareness of appellant's expectation of payment in the event of use.

Tors admitted that pilots are made in the industry for the purpose of showing them to prospective purchasers with a view to selling them commercially to make a series. The jury could infer that Tors was more than a social guest at the showing of the pilot; that he accepted the showing and offer of the synopsis with full knowledge of the conditions and circumstances of disclosure. Tors' presence with Ziv employees at the April 11 showing, plus his request to appellant for the mimeographed format of future series, make it apparent that Ziv was interested in the SEA DIVERS pilot and future possibilities of production of such a series. In May of 1956, appellant left the film for delivery to the Ziv vice-president in charge of syndication. It was not returned to appellant for more than a year.

All of the element of an implied contract between appellant and defendants was present if *Ziv made use of appellant's ideas and format.*

The use of an idea does not imply that the outlines were protectible literary property or that there was any copying as

to form or manner of expression. (*Donahue* v. *Ziv Television Programs, Inc., supra,* at page 601.)

An underwater sea adventure series, like a cowbody adventure series, has certain basic similarities which cannot be avoided. However, there are enough similarities in the basic plot ideas, themes, sequences and dramatic "gimmicks" between SEA DIVERS and SEA HUNT for a jury to infer that appellant's ideas and format were the inspiration for SEA HUNT and respondent Ziv, in fact, *used* appellant's ideas and format.

### THE CONVERSION-FRAUD ACTION

Plaintiffs might have proceeded against respondents Tors and Boren on various theories, such as breach of confidential relationship (*Thompson* v. *California Brewing Co.,* 150 Cal. App.2d 469, 474 [310 P.2d 436]), or inducing a breach of contract (*Imperial Ice Co.* v. *Rossier,* 18 Cal.2d 33 [112 P.2d 631]; *Donahue* v. *Ziv Television Programs, Inc., supra,* 245 Cal.App.2d 593, 607).

The trial judge's grant of the nonsuit in the conversion suit was correct. The fourth amended complaint seems to be based upon an alleged fraudulent conversion or a combination of the elements of both fraud and conversion. The complaint talks of a scheme to defraud plaintiff of property rights and his partnership assets and a scheme and plan to "appropriate and convert plaintiff's property." To prevail in this cause of action there must be substantial evidence of the improper use or fraudulent appropriation of plaintiff's property rights within the meaning of section 980a of the Civil Code.

As stated above, in the absence of a protectible property right, there can be no conversion of an idea. Whatever Tors learned at the pilot screening and from the mimeographed synopsis he retained, it was not sufficient to grant any property rights to appellant in the idea for the TV series. The outline of a jet pilot rescue was no more than an idea which was never developed in the form of a script or a story. Although Tors purportedly purchased from Boren the jet plane story of the pilot who was trapped under the sea, including a script, admittedly respondents Ziv and Tors used only the central idea.

Appellant here only had one possible literary composition, i.e., the script of the pilot involving the smuggler. This might have been subject to protection as a property right but the trial judge here was correct in holding in effect that there was

no substantial evidence that this script or composition had been used by the respondents as such.

Appellant makes no allegations in his brief of any substantial similarity between the protectible portions of his work and respondents' teleplays other than the fact that respondents' teleplays are similar in format with scuba divers, underwater adventure, underwater fights, treasure hunts, villains and heroes. There was, in fact, a lack of similarity between any protectible portions of the work produced by appellant and the work produced by respondents. *No claim is made here* that defendant Ziv *did not develop its own script and teleplays.* The writers for SEA HUNT were all separately hired by respondents. The use of the jet pilot sequence was the appropriation of an idea not a composition. Accordingly, adopting all inferences for appellant in the ''conversion-fraud'' action, there is no substantial evidence of any conspiracy to convert or fraudulently appropriate any protectible property rights of appellant. It is unnecessary for us to comment on any alleged evidence in support of the ''conspiracy.'' Civil conspiracy is not an independent tort or cause of action. Without a tort or wrong to property the conspiracy allegations against defendant in a civil action are meaningless. (*Herron* v. *Hughes,* 25 Cal. 555; *Tietz* v. *Los Angeles Unified School Dist.,* 238 Cal.App.2d 905 [48 Cal.Rptr. 245].)

In view of our rulings it is unnecessary for us to rule on the other allegations of error by the trial judge. In regard to the exclusion of evidence concerning custom, Tors himself testified concerning custom in the industry in the making of pilots to show to prospective purchasers. Other evidentiary rulings were within the discretion of the trial judge. As to the claim that the judge on several occasions took over the examination of the witnesses, ''The trial judge has a wide discretion in the control and ultimate scope of cross-examination of a witness . . .'' (*People* v. *Stone,* 239 Cal.App2d 14, 20 [48 Cal.Rptr. 469].) It is sufficient to say that there was no indication in the record of intentional unfairness or hostility by the trial judge against either appellant or his cause of action. The trial judge's extensive participation in the examination of witnesses may have been disconcerting to counsel but it was hardly prejudicial. Colloquy between counsel and the court, however disconcerting to counsel, was no more than a socratic pursuit of truth concerning points of law.

The judgment is reversed in the contract action (Superior

Court No. 737,447, 2d Civ. No. 31411). The judgment is affirmed in the conversion-fraud action (Superior Court No. 707,223, 2d Civ. No. 31410).

Appellant is to recover his costs on appeal.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing in No. 31411 was denied October 30, 1968, and the petition of respondent Ziv Television Programs, Inc., for a hearing by the Supreme Court in No. 31411 was denied December 11, 1968.