[Civ. No. 60482. Second Dist., Div. Five. Feb. 9, 1982.]

BERNICE MANN, Plaintiff and Appellant, v.
COLUMBIA PICTURES, INC., et al., Defendants and Respondents.

COUNSEL

Lee W. Landrum for Plaintiff and Appellant.

Shearer, Fields & Shearer, Mitchell, Silberberg & Knupp, Youngman, Hungate & Leopold, Joel M. Smith and Edward A. Ruttenberg for Defendants and Respondents.

OPINION

**STEPHENS, Acting P. J.**—Plaintiff and appellant, Bernice Mann, appeals from a judgment notwithstanding the verdict and conditional

grant of a new trial. The trial court granted the motions of defendants and respondents, Columbia Pictures Industries, Inc. (Columbia), Warren Beatty, and Robert Towne, after a jury awarded plaintiff a verdict in the sum of $185,000. Plaintiff also appeals from the lower court's order specifying certain issues to be without substantial controversy.

Mann seeks to recover the reasonable value of ideas embodied in a 29-page written format, entitled "Women Plus," which she allegedly submitted for Columbia's consideration as the basis for a motion picture. Plaintiff contends that her outline was accepted by Columbia, and used by defendants in the motion picture production "Shampoo." In her complaint, Mann alleged causes of action for plagiarism, quasi-contract, breach of an implied-in-fact contract, breach of a fiduciary or confidential relationship, an accounting, and the imposition of a constructive trust.

On March 16, 1979, defendants filed a motion for summary judgment or an alternative order specifying issues without substantial controversy. Defendants noticed the hearing on the motion for March 27, 1979, which was 51 days prior to the trial date then scheduled for this action of May 17, 1979. In plaintiff's opposition, counsel requested a denial of defendants' motion, or a continuance, so that further discovery already commenced could be obtained. Counsel argued that requests for admissions and the production of documents, together with defendants' answers to interrogatories, could provide facts essential to justify opposition to defendants' motion for summary judgment.

On its own motion, the lower court continued the hearing for summary judgment from March 27 to April 10, 1979. Plaintiff's counsel promptly filed an affidavit of prejudice, disqualifying the judge before whom the matter was scheduled for hearing. Because the matter was reassigned to another judge, the hearing was continued again. Defendants' motion was ultimately argued on April 26 and 27, 1979.

The lower court found certain triable issues of fact and denied summary judgment. The court did, however, summarily adjudicate the causes of action for plagiarism, breach of a confidential relationship, and constructive trust in favor of defendants.

The issues were further narrowed at trial in response to defendants' motion *in limine* regarding evidence of plaintiff's damages. The trial judge determined that the summary adjudication distinguished the

questions presented by plaintiff's second cause of action. While the allegations of an implied-in-fact contract between plaintiff and defendants raised triable issues, the trial judge dismissed the contentions of an implied-in-law obligation. Having dispensed with quasi-contract, plaintiff's potential recovery was restricted to the "reasonable value" of her ideas allegedly used in the production of "Shampoo." Evidence relative to the motion picture's earnings and number of showings was irrelevant. Accordingly, the cause of action for an accounting was removed from the case.

Mann challenges the lower court's jurisdiction to hear defendants' motion for summary judgment within 45 days of the trial date. Citing to Code of Civil Procedure section 437c, appellant argues that the court violated the statutory time frame by hearing the motion less than 30 days before trial. Consequently, Mann urges this court to declare the summary adjudication of issues a nullity.

Appellant also alleges that she was prejudiced by the trial court's summary dismissal of her count for quasi-contract. Mann asserts that defendants' alleged "unjust enrichment," the gravamen of such a count, was a factual issue which should have been submitted to the jury. Appellant contends that an "anomaly" between the lower court's minute order and the trial court's subsequent application of the final order for summary adjudication demonstrates prejudicial error. While the minute order identified unjust enrichment as "a triable issue of fact," the trial judge thereafter determined that quasi-contract was not an issue for the jury.

The controlling authorities refute Mann's jurisdictional challenge to the summary adjudication of issues in this case. Code of Civil Procedure section 437c provides in relevant part: "The motion [for summary judgment] shall be heard no later than 45 days before the date of trial, *unless the court for good cause orders otherwise.*" (Italics added.) The lower court merely granted the request of plaintiff's counsel for a continuance so that further discovery could be obtained. Plaintiff's affidavits submitted in opposition to defendants' motion indicated that crucial opposing facts might be secured with more time. Hence, the court exercised its statutory power and ordered a later hearing date.[1]

---

[1] In this regard, section 437c states: "If it appears from the affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as may be just."

"The granting or denial of a continuance to permit discovery is a matter which is left to the sound discretion of the trial court and an appellate court will not interfere with the exercise of that discretion except upon a clear showing that it has been abused. [Citation.]" (*Vanderbilt Growth Fund, Inc. v. Superior Court* (1980) 105 Cal.App.3d 628, 638 [164 Cal.Rptr. 621].) The record discloses no abuse of discretion. Furthermore, plaintiff's own objection to the judge scheduled to hear the motion for summary judgment resulted in the court's reassignment and continuance of the hearing to yet a later date. The instant appeal does not overshadow defendants' strict compliance with the procedural requisites, as the motion was properly noticed and the hearing timely scheduled at the outset. The lower court had jurisdiction to specify certain issues without substantial controversy.

■ Appellant's allegation that the trial court erred in dismissing her count for quasi-contract is also without merit. The determination that no breach of an implied-in-law contract occurred here is firmly supported by the judicial authorities in this state. A long line of decisions not only disposes of appellant's attempted quasi-contractual recovery, but also defines the only remaining substantive issue presented by Mann's complaint.

In "Women Plus," Mann wrote a brief description for six principal characters in a beauty salon setting. She provides a short narration for a number of scenes, most of which emanated from the salon. Whether Mann has a protectible property interest in "Women Plus" depends upon the originality of its form and manner of expression, the development of characters and sequence of events. (*Weitzenkorn* v. *Lesser* (1953) 40 Cal.2d 778, 789 [256 P.2d 947].) If defendants used the ideas contained in "Women Plus," as alleged, this use does not imply that plaintiff's 29-page outline was protectible literary property or that there was any copying as to form or manner of expression. (*Minniear* v. *Tors* (1968) 266 Cal.App.2d 495, 504-505 [72 Cal.Rptr. 287]; *Donahue* v. *Ziv Television Programs, Inc.* (1966) 245 Cal.App.2d 593, 601 [54 Cal.Rptr. 130].) The outline of various characters and scenes was no more than a collection of ideas which was never developed in the form of a script or a story. (*Minniear, supra*, at p. 505.)

■ Defendants could use the theme, plot, and ideas contained in "Women Plus." Mann's abstract ideas are not literary property. (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 732-733 [299 P.2d 257].) "The idea alone, the bare, undeveloped story situation or theme, is not protectible.

[Citations.]" (*Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, 789.) In order for Mann's complaint to state a cause of action for plagiarism, there must be some substantial similarity between defendants' "Shampoo" and protectible portions of plaintiff's "Women Plus." (*Kurlan* v. *Columbia Broadcasting System* (1953) 40 Cal.2d 799, 809 [256 P.2d 962].) But abstract ideas are not entitled to protection by a tort action for plagiarism. (3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 35, p. 1647.)

■    The material allegedly used by defendants must also constitute protectible property if Mann is to recover in quasi-contract. (*Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, 795.) "Therefore, the proof necessary to recover upon the theory of a contract implied in law is the same as that required by the tort action for plagiarism." (*Ibid.*) The lower court correctly determined that "there is no substantial similarity" between "Shampoo" and plaintiff's outline as to form and manner of expression, the portion which may be protectible property. Because defendants have used no property belonging to Mann, she cannot recover upon a quasi-contractual theory for the alleged use of her ideas. (*Ibid.*; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 4, pp. 31-32.)

Summary adjudication of the cause of action for plagiarism was properly rendered for defendants. In light of this determination, the trial court's dismissal of the count for quasi-contract is necessarily affirmed. Plaintiff's complaint was narrowed to the count for implied-in-fact contract. Mann's action rests entirely on defendants' alleged use of her ideas and the finding of an implied promise to pay the reasonable value of her material. (*Donahue* v. *Ziv Television Programs, Inc., supra,* 245 Cal.App.2d 593, 599, 601.)

■    The jurors determined that plaintiff's ideas were used in defendants' production of "Shampoo." Finding an implied-in-fact contract between plaintiff and defendants, as joint venturers, the jury returned a $185,000 verdict for Mann against Columbia, Beatty, and Towne.

The lower court granted defendants' motion and entered a judgment notwithstanding the verdict as to all defendants. The trial judge decided that a 1970 script by Towne was an "independent effort," and represented the product which emerged from Columbia as "Shampoo." The lower court was further satisfied that "no evidence" supported the jury's

finding of a joint venture among defendants. The thrust of plaintiff's appeal is that the judgment notwithstanding the verdict is erroneous.

■   The trial court's power to grant a judgment notwithstanding the verdict is identical to its power to grant a nonsuit or directed verdict. (*Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 34 [147 Cal.Rptr. 655].) In *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282], the Supreme Court set forth the rules circumscribing the trial judge's power to grant defendants' motion below: "The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' (*Brandenburg* v. *Pac. Gas & Elec. Co.* (1946) 28 Cal.2d 282, 284 . . . .)"

In order to affirm the trial judge's decision in this case, we "must resolve all conflicts in the evidence in favor of the plaintiff and decide, as a matter of law, that plaintiff would not be entitled to a verdict in [her] favor. [Citations.]" (*Rollenhagen* v. *City of Orange* (1981) 116 Cal. App.3d 414, 417 [172 Cal.Rptr. 49].) ■   We hold that the trial court's action in granting judgment notwithstanding the verdict was correct. There is a total absence of evidence that defendants Towne and Beatty had any contact with any individual possessing "Women Plus" until the time of this action. As discussed below, the similarities between plaintiff's treatment and the motion picture "Shampoo," by themselves, are not sufficient in this case to show either a submission of "Women Plus" to defendant Columbia, or the access and use of plaintiff's ideas by Towne and Beatty. The trial record shows only that Towne and Beatty independently wrote the "Shampoo" screenplay and script changes.

Considering plaintiff's evidence in the most favorable light, this court will now engage in a detailed review of the record regarding defendants' alleged contractual obligation.

## 1. The Facts:

From her experience as a beauty salon employee, Mann wrote descriptions for various characters and scenes evolving from a salon scenario. She prepared the outline as a possible framework for a motion picture. Mann titled the completed compilation "Women Plus," and registered her work with the Writers Guild of America on October 15, 1969.

Florence Klase, Mann's personal friend, had a neighbor, Evelyn Light, who knew Harry Caplan. Klase informed plaintiff that Caplan "was an important man at Columbia." As a favor to Mann, Klase agreed to deliver "Women Plus" and "Two Weeks," plaintiff's other work, to Light. Light was to submit the two writings to Caplan. Caplan assured Light that a Columbia "reader" would review plaintiff's works and determine if either could be the basis for a motion picture.

Plaintiff testified that in May, 1971, she placed "Women Plus" and "Two Weeks" in separate manila folders, enclosing both in a larger envelope for Klase's delivery to Light. Caplan accepted the envelope from Light. Uncontradicted testimony establishes that plaintiff never met or conversed with Caplan prior to trial. Mann never imposed any conditions on the submission of her works to Caplan. Plaintiff was pleased with the opportunity to have a "reader" review her efforts. Although compensation was not even discussed with Klase, Mann expected to be paid if either of her works was used in a Columbia motion picture. Caplan also knew that plaintiff expected compensation if the envelope's contents were used in a film.

At the time plaintiff's envelope was submitted to him, Caplan worked as the production manager on a motion picture titled "Happy Birthday, Wanda June." He was employed by Filmmakers Corporation (Filmmakers), but his salary was paid by Columbia. This situation arose from a financial arrangement between Filmmakers and Columbia for the release of "Happy Birthday, Wanda June." Columbia paid the production costs for the motion picture. As production manager, Caplan calculated these costs, including transportation, wardrobe, construction, and set operations. Caplan was on Columbia's payroll as a result of this production agreement.

Caplan had no association with the creative aspects of films. While he assessed various production expenditures, Caplan did not compute a

writer's earnings, because these payments represented a creative cost. He never read stories and has not worked in any studio's story department. As a production manager, Caplan's responsibilities did not include the submission of scripts to a story department.

Caplan was not involved in the production of "Shampoo" in any capacity. Uncontradicted testimony indicates that Caplan never met or conversed with either defendant Beatty or defendant Towne.

Caplan did not open plaintiff's envelope to inspect its contents. He submitted the envelope to a "reader" in the same condition in which he received it from Light. As a personal favor to Light, Caplan delivered on his assurance that a "reader" would review Mann's efforts. But he submitted plaintiff's envelope to Gary Crutcher, a story editor at Filmmakers. Caplan testified that he never submitted the envelope or its contents to any "reader" employed by Columbia.

Since they were "colleagues" at Filmmakers, Caplan felt that he could ask for Crutcher's time to read the material in the envelope and write a note to the author. Crutcher agreed to evaluate plaintiff's submission and address a written opinion to her.

Crutcher read material strictly for Filmmakers. He had no relationship with Columbia, nor did he summarize any material for that studio, during his employment at Filmmakers. Filmmakers did not have the right to use the files in Columbia's story department. Furthermore, Crutcher had no association with the production of "Shampoo." Uncontroverted testimony shows that Crutcher never met or spoke with either defendant Beatty or defendant Towne prior to this litigation.

After reading a written work, it was Crutcher's custom and habit to return an unacceptable submission to its author with a rejection letter. If the work appealed to him, Crutcher would recommend it to a superior at Filmmakers with a memorandum or synopsis. Crutcher has a file containing copies of all rejection letters he has written. He has a separate file with copies of all synopses he prepared for works which he recommended. Crutcher maintained the two files throughout his career as a story editor.

After this suit was initiated, Crutcher searched both files for a record of plaintiff's submission. He discovered the rejection letter for "Two Weeks," dated June 16, 1971. Plaintiff concedes receipt of the rejection

letter and the return of the "Two Weeks" manuscript. Crutcher's inspection of the two files revealed no entry for "Women Plus," neither a rejection letter nor a synopsis. Despite its enclosure in the same envelope with "Two Weeks," the "Women Plus" treatment was never returned to plaintiff.

In February, 1975, the motion picture "Shampoo" was released theatrically. Plaintiff and her husband viewed "Shampoo" in a local theatre that same month. They recognized several similarities between the motion picture and "Women Plus." Plaintiff determined that Columbia retained her submission of "Women Plus" and used the treatment in the production of "Shampoo." Shortly thereafter, plaintiff engaged Charles Rubin, an attorney, to determine whether legal action was available. Rubin conducted the initial investigation of the alleged "Columbia connection." However, Mann later enlisted the services of her current counsel, who filed plaintiff's complaint on January 13, 1976.

At trial, plaintiff and her husband both testified as to similarities they perceived between "Women Plus" and the motion picture "Shampoo." In addition, plaintiff introduced a chart into evidence for the jury's consideration. This chart presented a detailed comparison of several similarities between plaintiff's treatment and a written transcription of the scenes and dialogue in "Shampoo."[2] The jury also viewed the motion picture "Shampoo." Richard Lanham, defendants' expert analyst of literary works, compared "Women Plus," the written transcription of "Shampoo," and defendant Towne's 1970 written screenplay. Professor Lanham described "overall similarities" between plaintiff's outline and the motion picture.[3]

Trial testimony indicated that both Caplan and Crutcher began their employment with Columbia in 1973. After "Shampoo" was released, Caplan and Crutcher met in the hallway at Columbia studios. The men discussed Mann's allegation of similarities between "Shampoo" and the contents of her submission. The hallway encounter may even have followed the filing of plaintiff's complaint on January 13, 1976. Mann

---

[2]The parallel comparison listed ten areas of similarity between "Women Plus" and "Shampoo," ranging from the characters and story line to a review of various scenes.

[3]Professor Lanham referred to the beauty salon setting, two homosexual hairdressers, a hairdresser's sexual exploits, a mother-daughter competition involving sexual accusations, a shampoo girl, and the interruption of a hairdresser while he is working on a woman involved in a political gathering that evening. Lanham conceded that each of these features appeared in both "Women Plus" and "Shampoo."

points to this conversation and the preceding evidence of similarities as substantial support for the jury's determination that "defendants actually used plaintiff's ideas" in writing the "Shampoo" script. Considering the similarities, Mann defends the jury's finding that "defendants based the motion picture 'Shampoo' substantially upon plaintiff's ideas rather than on their own ideas or ideas from other sources."

Plaintiff's initial counsel, Rubin, twice telephoned Caplan at his Columbia office in March, 1975. Rubin "asked him if he had either of the two Mann scripts," but Caplan had no recollection of either "Two Weeks" or "Women Plus" in the first conversation. In the second telephone communication, however, Caplan informed Rubin that his secretary made a note for his file indicating that she returned plaintiff's "scripts." Later in the same conversation, Caplan recalled that he telephoned his secretary from a film location, instructing her to return plaintiff's "scripts" with a note. Caplan's secretary told him that she had already done so. However, the secretary made no copy of the note to Mann.

According to Rubin, Caplan stated that the secretary was no longer with him. Caplan could only recall her first name and believed that she was then employed by another company. But he informed Rubin that she was "a part-time secretary for Gary Crutcher and that Gary would know her name and present whereabouts."

Caplan earlier testified that he could not recall either conversation with Rubin. Caplan stated further that Columbia did not provide a secretary for production personnel. Since Caplan never had a secretary at Columbia, he testified that he could not recall instructing one to return plaintiff's scripts. Caplan remembered asking Crutcher to return plaintiff's envelope when the two men were still at Filmmakers.

At the time of plaintiff's submission, Caplan utilized a secretary who worked for Mark Robson, the director of "Happy Birthday, Wanda June." Caplan believes that he asked Robson's secretary to make a note when he submitted Mann's envelope to Crutcher. She maintained a file on films involving Caplan at Filmmakers. He presumes that Robson's secretary noted the envelope's transfer to Crutcher. At trial, however, Caplan denied discussing the note with Rubin.

Rubin telephoned Crutcher at his Columbia office in April, 1975. Crutcher did not remember any conversation with him. Nevertheless,

Rubin testified that Crutcher could not recall either "Two Weeks" or "Women Plus." Crutcher did not remember the woman identified as his "part-time secretary" in Caplan's second communication with Rubin. In his own notes of the April conversation, Rubin recorded Crutcher's belief that plaintiff's treatment "might be in Filmmakers' file."

According to Rubin, Crutcher related that Caplan was a production manager at Filmmakers in 1971. He stated that Filmmakers "was at Columbia" that same year.[4] Since Filmmakers moved to another studio, Crutcher indicated that he was no longer with the independent production company.

Caplan also testified that Filmmakers was located on Columbia property, outside the studio's gate. Columbia vacated a former storage facility, and the production company moved into the building after it was renovated. Filmmakers' geographical proximity with defendant Columbia does not indicate any connection between Caplan and Columbia's story department. Filmmakers' production function distinguished its relationship with defendant Columbia.

Plaintiff alleges, however, that Caplan "was an admitted employee of Columbia" when he received her envelope from Evelyn Light in 1971. Mann asserts that Caplan delivered her envelope to Columbia. She contends that Columbia possessed "Women Plus" since its 1971 submission. According to Mann, the jury reasonably inferred that her treatment was at Columbia's disposal during the 1974 filming of "Shampoo."

Caplan conceded that Columbia issued his payroll check at the time he received Mann's envelope. But the production manager's payroll position does not demonstrate the requisite connection between plaintiff's outline and Columbia's story department. Similarly, Rubin's 1975 telephone conversations with Caplan fail to show the nexus. The note in Caplan's file at his Columbia office, indicating the return of plaintiff's "scripts," does not show that the production manager ever submitted "Women Plus" to Columbia's story department. This court's close examination of the trial record revealed no evidence that Caplan delivered plaintiff's envelope to Columbia.

---

[4]Crutcher testified earlier that Filmmakers was located "just outside the old Columbia Studios."

Mann overlooks three sequences in the trial testimony relating to Caplan. First, Caplan was a Filmmakers' production manager when he received plaintiff's envelope. Caplan was paid by Columbia through a financial agreement under which that company assumed certain production costs on a motion picture project. Second, notwithstanding Caplan's assurance to Light, his receipt of plaintiff's envelope was not conditioned upon its submission to a Columbia "reader." Mann testified that she was "[g]lad to have it sent" so that someone could read her work. Finally, Caplan submitted the contents of plaintiff's envelope to Crutcher, not to Columbia.

Mann also focuses on a Columbia letterhead which appeared on Crutcher's correspondence of June 16, 1971. She contends that the letter evidences Columbia's rejection of "Two Weeks" through Gary Crutcher. According to Mann, the rejection letter demonstrates that Crutcher was a story editor for both Columbia and Filmmakers. Plaintiff asserts that Crutcher was a Columbia employee when he reviewed her submission, and at all other times pertinent to this action. Although she submitted both writings in the same envelope, Mann stresses that "Women Plus" was neither returned, nor was the treatment mentioned in Crutcher's rejection letter for "Two Weeks." She concludes that "Women Plus" was "apparently retained by Columbia."

Plaintiff's focus on Crutcher's rejection letter is shortsighted. Mann overlooks Crutcher's testimony that he read material strictly for Filmmakers when he reviewed plaintiff's submission in 1971, and he did not become a story analyst for Columbia until 1973. While the letterhead announced Columbia's presentation of "Happy Birthday, Wanda June," plaintiff disregards the rejection letter's references to Filmmakers as a production company. Trial testimony not only distinguished the "production" of a motion picture from its "release," but also explained the Columbia letterhead.

Caplan testified that Filmmakers produced "Happy Birthday, Wanda June," indicating that the company actually prepared and filmed the motion picture. Caplan stated that the words "Columbia Pictures Presents . . .", which appeared on the rejection letter, denote Columbia's release of "Happy Birthday, Wanda June." Columbia's function in releasing the motion picture was to arrange the sale of the finished product to film distributors for public viewing. In light of the film's brief release, Crutcher testified that the Columbia announcement on his rejection letter was "promotional."

Crutcher's rejection letter shows that Filmmakers refused "Two Weeks." The letter does not demonstrate Columbia's rejection of Mann's manuscript through Crutcher. Contrary to Mann's assertion, the announcement of "Happy Birthday, Wanda June" on Crutcher's correspondence does not indicate that he was a story editor for Columbia when he reviewed plaintiff's submission. Moreover, this court's inspection of the trial record disclosed no evidence that Crutcher submitted "Women Plus" to Columbia.

Columbia entered a written agreement to finance the production of "Shampoo" in February, 1974. The filming of "Shampoo" began in late March, 1974. Defendant Towne, a screenwriter, testified that he was still working on the "shooting script"[5] for "Shampoo" before the filming started. Towne also stated that he changed the script several times during the "shooting" of the motion picture. The screenwriter indicated that he never read "Women Plus," and has "never been anywhere near" Columbia's story department.

Defendant Beatty collaborated with Towne on the "Shampoo" script and its subsequent changes during filming. Beatty testified that he had never seen "Women Plus" before the trial. He also indicated that he was never inside the story department at Columbia. According to Beatty, no Columbia representative ever showed him another person's treatment or screenplay filed in the company's story department.

As the West Coast story editor for Columbia, George Thompson Snell managed the story department throughout 1971. Snell testified that during this time the only individuals with access to Columbia's storyfiles were story analysts, a "creative affairs" executive, Snell's assistant, and two secretaries. Columbia's policy of limited access even excluded company executives from the story files. Snell stated that motion picture actors and screenplay authors, such as defendants Beatty and Towne, did not have access to Columbia's story files.

Snell's responsibilities included processing all submissions received by Columbia's story department. Donnis Nagy, who was Snell's assistant in 1971, prepared "submission" cards for all materials received at the story department in Hollywood. Each submission card listed the title, author, date, source of submission, and form of the material (screenplay, treatment, book, etc.). After Nagy's initial indexing, Snell

---

[5]The final, completely detailed version of the motion picture's script.

assigned each submission to a story analyst for the preparation of a written synopsis and comment. Snell subsequently read each synopsis and comment, deciding whether to write a recommendation for the corresponding material to the responsible Columbia executive.

Before Snell read an analyst's review, Nagy made the necessary copies of each synopsis and comment for distribution to Columbia's story departments in New York and London. Similarly, the New York and London story departments forwarded to Hollywood copies of each synopsis and comment prepared in their respective offices. In addition, each story department at Columbia mailed a daily "submission list" to the other two locations indicating the materials received on that date in Hollywood, New York, and London. Nagy also prepared an "author" card and a "title" card for each submission upon receipt of an analyst's review. She filed these additional cards in two separate indexes, and then transferred the synopsis and comment to Snell for his appraisal.

Nagy stated two purposes underlying the distribution of all analysts' reviews and the maintenance of separate files for submission, author, and title cards. Principally, the procedure assured that the three story departments each had complete records of every submission. The equality among the files was designed to avoid duplicating coverage on a submission. Nagy and Snell both testified that the indexing procedure outlined above was followed for all submissions throughout 1971—the year in which Mann alleges Columbia's receipt of "Women Plus."

Susan Merzbach was Columbia's executive story editor at the time of trial. She began her employment with Columbia in 1978. Merzbach testified that Columbia's current system of computer indexing replaced the card procedure, and also records every submission ever made to the story department. In preparation for trial, Merzbach searched through Columbia's story files containing submission cards, author cards, title cards, synopses, and other documents from preceding years. For the purpose of this action, Snell and Nagy joined in Merzbach's inspection. They examined the story files for evidence relating to the submission of Robert Towne's "Shampoo" screenplay and the alleged submission of Bernice Mann's "Women Plus."

At trial, Merzbach, Snell, and Nagy each identified submission, author, and title cards for defendant Towne's "Shampoo" which were located in their files search. Nagy testified that she typed these cards.

The two submission cards indicated that Towne's 161-page screenplay was first read and summarized in New York on August 7, 1970, with Snell receiving the screenplay, synopsis and comment in Hollywood on August 11, 1970. More importantly, *neither Merzbach, Snell, nor Nagy found any indication in the story files that Mann's "Women Plus" was ever submitted to Columbia at any time.*

Plaintiff alleges that Columbia made its story department facilities available to Beatty and Towne while the studio possessed "Women Plus." Towne testified that he "could have" gone to Columbia and asked a secretary, or someone in the story department, to "read over something [he] had read and give comments" until two weeks before filming started on "Shampoo." Pointing to this testimony, and Towne's collaboration with Beatty on script changes during filming, Mann asserts that Columbia allowed the men to examine "Women Plus" and use plaintiff's ideas in "Shampoo." In light of several similarities between her outline and the motion picture, together with plaintiff's evidence of access, Mann concludes that the trial court had no reason to disturb the jury's determination below.

Plaintiff's alleged chain of submission to Columbia has several missing links which this court recounted above. Towne's testimony that he "could have" obtained comments from Columbia's story department on material he read does not support the access argument. Uncontradicted testimony shows that neither Towne nor Beatty had any contact with either Caplan or Crutcher prior to this litigation. Aside from their alleged access to Columbia's story department, Mann offers no evidence demonstrating how Towne or Beatty could possibly have read her treatment.

The uncontroverted statements of Merzbach, Snell, and Nagy indicate no record that "Women Plus" was ever submitted to Columbia's story department. The evidence shows only that "Women Plus" was not in Columbia's story files for either defendants' examination or employees' comments. The access of Towne and Beatty to "Women Plus" may only be inferred from the similarities between plaintiff's treatment and the motion picture "Shampoo." Apart from these similarities, Mann's evidence is insufficient to infer defendants' access to "Women Plus," as plaintiff offers only speculation and the mere possibility that Caplan or Crutcher submitted the missing treatment to Columbia's story department.

At trial, defendants presented extensive evidence on Towne's "prior creation" of the 1970 "Shampoo" screenplay. The trial judge cited Towne's "independent effort" in granting judgment notwithstanding the verdict as to all defendants, and this court will review the screenwriter's endeavor.

Towne testified that the idea for a screenplay involving a hairdresser first occurred to him in 1965. The screenwriter also met defendant Beatty that same year, and they discussed an effort to write a hairdresser script. Towne identified a personal journal in which he recorded notes for his eventual screenplay as early as 1965. In addition to script ideas, the journal entries included the screenwriter's thoughts on structure, dialogue, and his initial meeting with Beatty.

Towne and Beatty further developed ideas for a hairdresser script in 1966. Towne wrote a screenplay which exceeded 200 pages in 1967. This manuscript was not completed, but it contained scenes ultimately incorporated in the motion picture "Shampoo." In 1968 Towne sat in beauty shops and observed their operation. The screenwriter and Beatty discussed development of the script through the year. Towne wrote another script with an incomplete narrative in 1969. This script also included scenes which appeared in the motion picture "Shampoo."

Defendant Towne wrote the first complete screenplay on the hairdresser subject from January 1 to January 20, 1970. Initially titled "Up or Down," Towne changed the title to "Shampoo" and submitted a copy of the screenplay to Jerry Ayres. Ayres was a producer who worked at Columbia. He gave Towne's manuscript to Robert Lovenheim, who was an executive in the creative affairs department at Columbia.

Lovenheim testified that he read the "Shampoo" screenplay in 1970 and submitted it to Columbia's story department. Phillip Ansalone later testified that he was the Columbia "reader" who summarized Towne's screenplay in New York on August 7, 1970. Ansalone's summary of "Shampoo" was received into evidence. Bosley Crowther, a retired motion picture critic and Columbia consultant, indicated at trial that he read the "Shampoo" screenplay, and prepared a memorandum covering the manuscript for Columbia's president on October 6, 1970. Defendants stress that the submission of Towne's "Shampoo" screenplay and subsequent sequence of events all occurred long before the alleged submission of plaintiff's "Women Plus" in 1971.

## 2. The Law:

The analytical framework for the case at bar is shaped by the answers to two questions. (*Desny* v. *Wilder, supra,* 46 Cal.2d 715, 744.) First, did Mann submit "Women Plus" to defendants for sale? The trial record shows no evidence, nor does plaintiff even allege, that her treatment was ever submitted to either defendant Beatty or defendant Towne. Mann alleges, however, that "Women Plus" was submitted to defendant Columbia through either Caplan or Crutcher. The alleged access of Towne and Beatty to the treatment is contingent upon its purported presence in Columbia's story files. Therefore, the asserted contractual obligation exists, if at all, only between Mann and Columbia. (*Donahue* v. *Ziv Television Programs, Inc., supra,* 245 Cal.App.2d 593, 607-608.)

The existence of that contractual obligation is also dependent upon the answer to the second question. Did Columbia, knowing that "Women Plus" was offered to it for sale, accept and use that treatment, or any part thereof, in the motion picture "Shampoo?" Since there was no express agreement in this case, Mann must show Columbia's implied promise to pay for the alleged use of her ideas. (*Desny* v. *Wilder, supra,* 46 Cal.2d 715, 738.)

For this court to find that Mann and Columbia entered an implied-in-fact contract, plaintiff must demonstrate that she clearly conditioned her offer of "Women Plus" upon an obligation to pay for it, or its ideas, if used by Columbia; and Columbia, knowing the condition before it knew the ideas, voluntarily accepted their disclosure (necessarily on the specified basis) and found them valuable and used them. (*Desny, supra,* 46 Cal.2d at p. 739.) Columbia's implied promise, if it is to be found, must be based on circumstances which were known to the studio at and preceding the time the ideas were allegedly disclosed to it. Columbia must have voluntarily accepted "Women Plus" with knowledge of the conditions of tender. (*Ibid.; Faris* v. *Enberg* (1979) 97 Cal.App.3d 309, 318 [158 Cal.Rptr. 704].)

In this case, Mann must prove Columbia's conduct from which defendant's promise may be implied. (*Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, 794.) The trial court properly instructed the jurors on

Mann's burden, and the preceding prerequisites for finding an implied-in-fact contract.[6]

The submission of "Women Plus" to Columbia is not only a requirement for the contractual obligation alleged herein, but it is also the basis for plaintiff's argument that defendants Beatty and Towne had access to her treatment. For purposes of this discussion, the court assumes that "Women Plus" remained enclosed in the envelope transferred from plaintiff to Florence Klase, Evelyn Light, and Harry Caplan. Caplan was a Filmmakers production manager when he received plaintiff's envelope from Light. Mann concedes that the submission of the envelope was not conditioned on its delivery to Columbia. Caplan transferred the envelope to a colleague, Gary Crutcher, who was a story editor at Filmmakers. There is no substantial evidence in the trial record that either Caplan or Crutcher acted for Columbia in accepting Mann's submission. (Cf. *Minniear v. Tors, supra,* 266 Cal.App.2d 495, 498, 504.)

Mann stresses that the jury viewed the motion picture "Shampoo." The jurors also examined plaintiff's chart comparison of several similarities between "Women Plus" and "Shampoo." Mann also emphasizes the script changes made while filming "Shampoo," and Columbia's willingness to review something Towne had read and offer comments before filming the motion picture. Plaintiff concludes that the foregoing is sub-

---

[6] The trial court's jury instruction stated: "In her action against the defendants for breach of an implied contract, plaintiff BERNICE MANN has the burden of establishing, by a preponderance of the evidence, all of the facts necessary to prove each of the following issues:

"1. That plaintiff submitted her ideas to the defendants and that the defendants received them.

"2. That before plaintiff submitted her ideas to the defendants, she clearly conditioned her disclosure upon defendants' agreement to pay for those ideas of plaintiff's which the defendants used, if any.

"3. That defendants knew, or should have known, the condition upon which the disclosure was being made before the disclosure was made.

"4. That the defendants voluntarily accepted the submission on plaintiff's terms and thereby impliedly agreed to pay plaintiff for any of her ideas which they might use.

"5. That in writing the script for the motion picture 'Shampoo,' the defendants actually used plaintiff's ideas, that is, that the defendants based the motion picture 'Shampoo' substantially upon plaintiff's ideas rather than on their own ideas or ideas from other sources.

"6. That the ideas of plaintiff which were used, if any, had value.

"In order to find for the plaintiff, you must find that she has established, by a preponderance of the evidence, each and every one of the foregoing described issues; otherwise, you must find for the defendants."

stantial evidence for the jury's determination that "Women Plus" was submitted to Columbia. Mann also asserts that the jury reasonably inferred the access of Towne and Beatty to her treatment, and their use of her ideas in filming "Shampoo."

Similarity, access, and use present questions of fact for the jury. (*Kurlan* v. *Columbia Broadcasting System, supra,* 40 Cal.2d 799, 810.) One of the jury's functions in this action was to determine whether such similarity existed between "Shampoo" and "Women Plus" as to suggest defendants' use of ideas originating with plaintiff. (*Stanley* v. *Columbia Broadcasting System* (1950) 35 Cal.2d 653, 660 [221 P.2d 73, 23 A.L.R.2d 216].)

In *Kovacs* v. *Mutual Broadcasting System* (1950) 99 Cal.App.2d 56, 65 [221 P.2d 108], the court declared: "Proof of substantial similarities gives rise to an inference of both access and copying. [Citations.] The weight to be given the inference as against direct evidence of nonaccess and noncopying is a question for the trier of fact. There can be no copying in the absence of similarity. Whether there are substantial similarities to give rise to an inference of access and copying is one of fact to be determined by a comparison of the two [works] upon the basis of the 'impression received by the average reasonable man.' [Citations.] The implied finding of the jury of similarity is binding upon a reviewing court if supported by substantial evidence. [Citation.]"

The jury's determination of similarity between "Women Plus" and "Shampoo" was substantially supported by the jurors' examination of plaintiff's chart comparison and view of the motion picture. But any similarities between the two works in this case are without legal significance. The jury may have inferred defendants' access and use of "Women Plus" from its comparison with "Shampoo." This inference, however, was rebutted by clear, positive and uncontradicted evidence.

■ Testimonial evidence which is neither impeached nor contradicted by other evidence, and is not inherently improbable, should be accepted as true by the trier of fact. (*Estate of Kuttler* (1960) 185 Cal. App.2d 189, 206 [8 Cal.Rptr. 160].) As a general rule, a witness' uncontradicted testimony to a particular fact should be accepted as proof of the fact, and may not be disregarded. (*Ibid.*) Although a witness is uncontradicted, the trier of fact may totally reject the witness' testimo-

ny, provided the trier of fact does not act arbitrarily. (*Hicks* v. *Reis* (1943) 21 Cal.2d 654, 659-660 [134 P.2d 788].)

"To these well settled rules there is a common sense limited exception which is *aimed at preventing the trier of the facts from running away with the case.* This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities. When the rebutting testimony is of such a nature that the minds of reasonable men cannot differ on the subject, then the trier of the facts cannot, and should not be permitted to, indulge in the inference." (*Hicks* v. *Reis, supra*, 21 Cal.2d at p. 660; italics added.)

"Just where testimony becomes 'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved' is, of course, a matter of judgment." (*Donahue* v. *Ziv Television Programs, Inc., supra*, 245 Cal.App.2d 593, 598; *Casetta* v. *United States Rubber Co.* (1968) 260 Cal.App.2d 792, 815 [67 Cal.Rptr. 645].) Caplan, Crutcher, Beatty, and Towne all testified that the first two men had no contact with the two defendants before this litigation. Their testimony in this regard was not even challenged by plaintiff. More importantly, neither Merzbach, Snell, nor Nagy was impeached or contradicted in testifying that Columbia's story files contained no record that Mann's "Women Plus" was ever submitted to the studio. The preceding testimony constitutes a clear and positive rebuttal of the inference of access and use raised by the similarities between the two works herein.

This court is not restricted to a consideration of Towne's 1970 screenplay as a representation of the motion picture "Shampoo." (*Barbaria* v. *Independent Elevator Co.* (1956) 139 Cal.App.2d 474, 482 [285 P.2d 91].) Mann alleges that Towne and Beatty had access to "Women Plus" in Columbia's story department before they made changes in the "shooting script" for "Shampoo." If the two defendants did not use her ideas in the "shooting script," the fact that the motion picture may strongly resemble "Women Plus" does not afford plaintiff a cause of action against Columbia for breach of an implied contract. (*Teich* v. *General Mills, Inc.* (1959) 170 Cal.App.2d 791, 804-805 [339 P.2d 627].)

The "independent effort" of Towne and Beatty in developing the "Shampoo" script provides Columbia with a complete defense against the contractual obligation alleged herein. (*Teich, supra,* 170 Cal.App. 2d at pp. 803-805.) The defense is established in this case because the inference of access and use was rebutted. Since there was neither a submission of "Women Plus" to Columbia, nor any contact between the screenplay authors and the people alleged to have possessed plaintiff's treatment, there is no substantial evidence to support the jury verdict.

The action of the trial court in granting judgment notwithstanding the verdict was correct. "[T]he trial court can hold as a matter of law that an inference has been dispelled where it has been rebutted by clear, positive and uncontradicted evidence not open to doubt. If the fact inferred is necessary to establish an essential element of the case then judgment notwithstanding the verdict is proper. [Citation.]" (*Apodaca v. Trinity Lumber Co.* (1964) 226 Cal.App.2d 1, 4 [37 Cal.Rptr. 731].) Defendants produced evidence that "Women Plus" was never submitted to Columbia, and neither access nor use existed. Since each of these elements is essential to Mann's recovery, as a matter of law, there is no contractual obligation for this court to enforce here. (*Leonard v. Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 515 [305 P.2d 36].)

This court need only accept the jury's reasonable inferences which are supported by substantial evidence. (*Lucas v. Southern Pacific Co.* (1971) 19 Cal.App.3d 124, 136 [96 Cal.Rptr. 356]; *Mize v. Atchison, T. & S.F. Ry. Co.* (1975) 46 Cal.App.3d 436, 454 [120 Cal.Rptr. 787].) The remaining proof offered by plaintiff cannot support an inference that her treatment was submitted to Columbia, much less act as direct evidence of the same. Mann arranges an assortment of possibilities for the submission of "Women Plus": the geographical proximity of Filmmakers and Columbia; the production agreement for a motion picture, under which a Filmmakers production manager received Columbia paychecks; a Columbia promotion for the same motion picture on a Filmmakers rejection letter; and 1975 phone calls to the Columbia offices of former Filmmakers employees.

The preceding possibilities are not substantial evidence that "Women Plus" was submitted to Columbia. Moreover, "mere possibilities" do not afford the basis for factual inferences. (*Sweeney v. Pozarelli* (1964) 228 Cal.App.2d 585, 591 [39 Cal.Rptr. 601].) The nonexistence of sub-

mission was established by testimony set forth above. (*Leonard* v. *Watsonville Community Hosp., supra*, 47 Cal.2d 509, 515.) "A legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established. [Citations.] It is axiomatic that 'an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork.' [Citation.] Yet that is exactly what [Mann is] attempting to do." (*Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 602 [315 P.2d 19].)

For access, "[t]here must be a reasonable possibility of viewing plaintiff's work—not a bare possibility." (3 Nimmer on Copyright (1981) § 13.02 [A], p. 13-12.) We have already detailed the rebuttal of the access inference. And the foregoing possibilities of submission to Columbia are conjectural. Since plaintiff alleges this basis for the access of Towne and Beatty, the bare possibility of their viewing "Women Plus" is premised on mere speculation. This is insufficient proof of an essential element. (*Ibid.*)

Finally, "if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) With the "ponderable legal significance" of the similarities between plaintiff's treatment and "Shampoo" removed from this case, rumination over "Women Plus" is but speculation on possibilities.

We have resolved the conflicting evidence in favor of Mann. Defendants rebutted the legitimate inference to which her evidence was entitled. Viewed in its most favorable light, plaintiff's evidence is legally insufficient to support a recovery. (*Doria* v. *International Union* (1961) 196 Cal.App.2d 22, 32 [16 Cal.Rptr. 429].) Plaintiff's failure to establish a prima facie case renders a complete defense to the alleged contractual obligation.

We affirm the order of the trial court granting judgment notwithstanding the verdict. In view of our holding, it is not necessary to discuss the trial court's conditional grant of a new trial, or the other points argued by the parties herein.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 7, 1982.